UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In Re:                                                    Bankruptcy No. 10-31028
                                                          Chapter 7
Dennis J. Charles,

                    Debtor.
_____/
Kip M. Kaler as Bankruptcy Trustee
for Dennis J. Charles,

                    Plaintiff,

          vs.                                             Adversary No. 11-7008

Dennis J. Charles,

                    Defendant.
_____/

**MEMORANDUM AND ORDER**

Chapter 7 Bankruptcy Trustee Kip M. Kaler initiated this adversary proceeding on

February 10, 2011, by filing a complaint, seeking a denial of Debtor Dennis J. Charles'

bankruptcy discharge under 11 U.S.C. § 727(a)(2) and (4).  In his Answer and Amended

Answer, Charles denied the allegations and asserted that the adversary complaint was without

factual or legal basis.  The matter was tried on September 29, 2011, and the parties submitted

post-trial briefs on October 20, 2011.  The Court finds in favor of the Trustee and orders that

Dennis J. Charles is denied a discharge in bankruptcy.

**I.  FINDINGS OF FACT**

**A.        Pre-Bankruptcy Business Interests**

Debtor became involved in the concrete construction business in 1986.  On January 15,

2002, he started Concrete Specialists, Inc., which provided various concrete products and

services.  In early 2007, Debtor began forming business entities with Chad Ohnstad, who started

working in the concrete industry nine years ago.

In February 2007, Debtor, Chad Ohnstad, and Jeremy Burnside formed Tri-Star

Properties, LLC, a commercial rental and storage business.  Ohnstad owned 50%, Debtor owned

25% and Burnside owned 25% of Tri-Star.  In January 2009, Debtor purchased Burnside's

interest in Tri-Star, resulting in Ohnstad and Debtor each owning 50% of Tri-Star.

Tri-Star's assets include two parcels of land.  One parcel is bare land purchased from

Gordon and Marilyn Eid on a contract for deed.  On the other parcel, there are two buildings, a

commercial building and a storage building with 21 individual units for rent.  At one time, three

tenants leased space in the commercial building, including All Finish Concrete, Inc., a full-

service concrete business owned solely by Ohnstad.

In March 2009, two months after Debtor purchased Burnside's interest in Tri-Star,

Debtor and Ohnstad formed a new business, Tru Wall Concrete, Inc.  Tru Wall's sole business

was laying concrete foundations, primarily for residential properties.  Debtor and Ohnstad each

owned 50% of Tru Wall.  Tru Wall operated without advertising or a business telephone.  All its

work came from referrals from All Finish.  Tru Wall was one of the three tenants that leased

space from Tri-Star.

Debtor closed Concrete Specialists in December 2009 because the business ran out of

work with a particular contractor.  When Concrete Specialists stopped doing business, its assets

included equipment and accounts receivable.  All Finish purchased some of Concrete

2

Specialists' equipment, and Tru Wall purchased the rest of its assets and assumed its debt to Western State Bank.[1]

Tru Wall stopped doing business after January 1, 2011.[2] According to Ohnstad, Tru Wall was not making money because there was a downturn in the economy and the concrete business is competitive. Residential work was hit the hardest, he said, and they had to operate on much smaller margins.

After Tru Wall stopped doing business, All Finish continued to lease some of Tru Wall's equipment (a couple of pickups and a boom truck) for $2,500. Tru Wall's other equipment is located on Tri-Star's property. All Finish hired some of Tru Wall's former employees, including Debtor. Debtor has worked for All Finish since April 2011.

Tri-Star continues to operate its commercial rental and storage business. At the time of trial, All Finish was the only tenant leasing space from Tri-Star. Although All Finish is not using all of the space, it is paying the rent on the entire space.

---

[1] Ohnstad and Debtor, on behalf of Tru Wall, signed a commercial promissory note with Western State Bank on April 30, 2010, in the amount of $100,000. The stated purpose of the loan was to "Buyout Concrete Specialists ($50M) and reimburse borrower [Tru Wall] for equipment purchase."

According to Matt Mueller, a business banking officer for Western State Bank, Concrete Specialists owed Western State Bank $65,000 when Tru Wall bought it out. All Finish paid $15,000 of the $65,000, and Tru Wall financed the rest. At the time of the buyout, Western State Bank's view of the value of collateral securing the debt Concrete Specialists owed to the bank was that the collateral was worth less than the debt, and the bank would have taken a loss had Debtor liquidated Concrete Specialists.

[2] Debtor testified that Tru Wall closed in August 2010 because Ohnstad did not want to expose himself to liability when Debtor filed for bankruptcy. According to the Trustee and Ohnstad, however, Tru Wall stopped its business operations in January 2011.

B.      **Bankruptcy**

On August 17, 2010, Debtor filed a voluntary petition for relief under Chapter 7 of the
Bankruptcy Code.  He filed his Schedules and Statement of Affairs two weeks later.  On
Schedule A, Debtor listed the value of his house as $225,000 and the amount of the secured
claim against it as $258,000.  On Schedule D, Debtor listed the debt secured by a first mortgage
against his house in the amount of $224,000, and the debt secured by a second mortgage in the
amount of $34,000.

In his Adversary Complaint filed on February 10, 2011, the Trustee alleged that Debtor
knew or should have known that the "true current value" of Debtor's house exceeded the debt
against it.  In support of this claim, the Trustee offered evidence that the house was worth
$265,000 and the debt against it totaled less than $149,000 at the time Debtor filed his petition
for bankruptcy relief.

On October 20, 2011, weeks after trial of this adversary proceeding, Debtor filed an
Amended Schedule D, listing the debt secured by a first mortgage on his house as $216,963.96,
and the debt secured by a second mortgage as $31,399.46 (collectively $9,636.58 less than the
figures included in Debtor's original Schedule D).[3]

On Schedule B, Debtor reported that the value of his 50% stock ownership in Tru Wall
was $1.00 and his 50% stock ownership in Tri-Star was $1.00.  In his complaint, the Trustee
alleged that Debtor knew or should have known that Debtor significantly understated the true
value of his interests in Tru Wall and Tri Star.

---

[3] At trial, Debtor testified that he thought he listed the debt against his house correctly in
the first version of the bankruptcy schedules.  He said he made a mistake and could not explain it
other than he was overwhelmed at the time.

4

Debtor filed an Amended Statement of Financial Affairs on January 19, 2011.  The

original Statement of Financial Affairs filed in August 2010 listed Debtor's income from

employment or the operation of a business as:

| AMOUNT | SOURCE |
|---|---|
| $11,293.00 | 2009 K-1 income from Tri Star Properties LLC |
| $44,292.00 | 2008 adjusted gross income |
| $-49,098.00 | 2009 K-1 income from Tru Wall |

The Amended Statement of Affairs added:

| | |
|---|---|
| $44,950.00 | 2010 Gross Income from All Finish Concrete, Inc. |
| $17,548.00 | 2009 Adjusted Gross Income |
| $5,000.00 | Tru Wall (dividend) - 02/05/10 |
| $10,000.00 | Tru Wall (dividend) - 03/04/10 |

At trial, Debtor testified he omitted the $15,000 in distributions from his original schedules

because he forgot about them.  He said he amended his schedules when Ohnstad brought the

error to his attention, and claimed that the omission was not an effort to deceive anyone.  The

Trustee alleged that Debtor knowingly failed to disclose the $15,000 in owner's equity

distributions from Tru Wall and significant income from business entities in which he held an

ownership interest.

The Trustee alleged that each of the nondisclosures described above are material and

justify a denial of discharge under sections 727(a)(2) and (a)(4)(A).  Debtor denied the Trustee's

allegations.  The parties' arguments and evidence offered at trial focused on Debtor's alleged

failure to disclose the true value of Debtor's interest in these assets.  Consequently, the findings

of fact and conclusions of law will address each asset in turn.

5

C.    **Debtor's Disclosures**

    1.    <u>Tri-Star</u>

    As noted above, Debtor, Chad Ohnstad, and Jeremy Burnside formed Tri-Star in

February 2007.  Ohnstad owned 50% of Tri-Star, and Debtor and Burnside each owned 25% of

the company.  On April 6, 2007, the three "members" executed "Tri-Star Properties, LLC Buy-

Sell Agreement."  This agreement provided that no member may transfer or encumber his

interest in Tri-Star unless he first offered his shares to the company and then to the other

members.  The agreement included a separate provision granting Debtor and Burnside a first

right to purchase, or to refuse to purchase, each other's shares.  The agreement also included a

paragraph allowing the members to set a stipulated purchase price for each "unit" sold under the

agreement.  If the members were unable to agree on a price per unit, the default value of Tri-

Star's interests was the "value as reported on the real estate tax statement for the year prior to the

year of sale," less a 15% discount that was applied under certain circumstances.  Debtor's Ex.

109.  Tri-Star's 2010 Property Tax Statement provides that the estimated market value of its

property was $437,000 for 2009 and $462,300 for 2010.  The 2010 Property Tax Statement for

the Eid property, also owned by Tri-Star, provides that the estimated value of this property was

$59,000 in both 2009 and 2010.

    Debtor's Exhibit 109, offered and received at trial, included two copies of the buy-sell

agreement.  The first copy, which was dated and signed, did not include a stipulated purchase

price for each unit.  The second copy, which was not dated, includes the words "tax value"

scribbled in blanks designated for the purchase price.  It is not clear who wrote these words or

6

what the "tax value" of each "unit" to be sold under the agreement would be because the parties offered no evidence of this value.

In January 2009, Debtor bought Burnside's 25% ownership interest in Tri-Star for $25,000. There is no evidence that Debtor and Burnside relied on the buy-sell agreement to determine the price Debtor paid for Burnside's "units." To the contrary, Debtor testified that the $25,000 amount had nothing to do with value, but instead was the value of moving forward without Burnside.

On April 24, 2009, Ohnstad and Debtor, on behalf of Tri-Star, executed a promissory note to Western State Bank in consideration for a loan with a principal balance of $519,473.72. On the same date, Debtor completed a personal financial statement for the bank. In this financial statement, Debtor listed his 100% interest in Concrete Specialists as valued at $10,000, his 50% interest in Tri-Star as valued at $63,000, and his 50% interest in Tru Wall as valued at $25,000. Debtor signed the financial statement, certifying that the information provided in it was true, correct and complete.

Matt Mueller, a business banking officer for Western State Bank, testified that the bank arranged for the preparation of an appraisal of Tri-Star's property in April 2009 in conjunction with the $519,473.72 loan it made to Tri-Star. Although the appraisal was not admitted into evidence, Mueller confirmed that the bank relied on the appraisal in valuing Tri-Star and extending the loan. Specifically, the bank relied on the appraiser's conclusion that the value of Tri-Star's property was $640,000. Mueller further testified that he "probably" told Ohnstad and Debtor Tri-Star's appraised value when the bank obtained the appraisal and closed on the loan.

At trial, Tri-Star's 2008, 2009 and 2010 tax returns were also received into evidence. Tri-Star's 2009 tax return listed buildings and other depreciable assets totaling $397,111 at the beginning of 2009 and $504,479 at the end of the year. In the course of his investigation of Debtor's assets, the Trustee learned that this increase was attributable to Tri-Star constructing the 21-unit storage building that year. Tri-Star's liabilities at the end of 2009 totaled $497,999, and the partners' capital accounts totaled $113,087. During his testimony, the Trustee characterized the $113,087 as Tri-Star's partner equity or book value, but acknowledged that it is not fair market value.

Tri-Star's 2009 tax return also shows Tri-Star received $86,681 in gross rental income derived from both the commercial building and the storage units. After subtracting expenses from the gross rentals, Tri-Star realized a net rental real estate income of $23,569. The Trustee characterized this as cash flow or profit, although he acknowledged that Tri-Star would have had to pay its mortgage out of that amount.

Tri-Star's 2010 tax return confirms that Tri-Star continued to show net income throughout 2010, and to realize an increase in partner equity. Tri-Star's 2010 tax return reflects revenue in gross rents of $101,460 and expenses of $65,721, resulting in net income of $35,739. By the end of 2010, Tri-Star had reduced its debt to Western State Bank to $457,661.56. The partners' equity or "book value" increased to $142,146 in 2010. At trial, Mueller testified that Tri-Star's loan balance was currently $425,000, suggesting that Tri-Star continues to be a viable business and that its equity continues to grow.

In support of his decision to assign a $1.00 value to his interest in Tri-Star, Debtor offered his testimony and the testimony of Ohnstad. Ohnstad's testimony supported Debtor's

8

estimate that his interest in Tri-Star was worth only $1.00.  Specifically, Ohnstad stated that if

potential buyers wanted a commercial space they would build their own because Tri-Star's

commercial building is specialized for the construction business.  The two parcels of land owned

by Tri-Star would sell for less than the debt, in his opinion.  Ohnstad also testified he thought

Debtor's interest in Tri-Star is worth nothing because of the formula in the buy-sell agreement.

Likewise, Debtor testified that he assigned values of $1.00 to his ownership interest in

Tri-Star because any potential buyer would be a 50% owner with Ohnstad and, therefore, he did

not think anyone would want to buy his interests.  In Debtor's opinion, anyone who wanted to go

into business would do so on his own.  Debtor testified that he based the value he assigned to

Tri-Star on his knowledge.  On cross examination, he admitted that his value estimate was not

based on "documentation" -- no appraisals, no corporate records, no financial statements.  He

also admitted that he did not consider the restrictions in the buy-sell agreement when he valued

his interest in Tri-Star.  In fact, he did not even possess a copy of the buy-sell agreement at the

time he completed his bankruptcy schedules.

2.    Tru Wall

Debtor and Ohnstad formed Tru Wall in March 2009.  It does not appear that the

company found immediate success.  In fact, Tru Wall's 2009 tax return shows a business loss of

$-98,195.  Tru Wall did not disclose a 2010 tax return; however, its 2010 financial statements

suggest Tru Wall's financial condition improved.  During his testimony, the Trustee claimed that

Tru Wall's financial statements and other information he considered show that the company had

equity at the time Debtor petitioned for bankruptcy.  Tru Wall's financial statements confirm

that, by the end of 2010, Tru Wall had net income and equity.  In November 2010, just three

9

months after Debtor filed his bankruptcy petition, Tru Wall's balance sheet reflects equity of

$157,761.22. By December, this equity had diminished to $19,581.34; however, between

November and December 31, 2010, the statements had been adjusted to reflect distributions to

the partners in the sum of $16,000 ($8,000 to Debtor).[4]

According to the Trustee, Tru Wall's November and December 2010 balance sheets show

equity, even though its equipment and vehicles are substantially undervalued. On its December

2010 balance sheet, Tru Wall listed its equipment and vehicles with a value of $45,113.84.

However, on Tru Wall's Equipment/Vehicle List dated April 16, 2010, these assets were valued

at $182,662. Plaintiff's Ex. 17. Mueller testified that the values on this equipment/vehicle list

were based on Ohnstad's values, actual purchase price, research and the price of comparable

equipment. He believed the figures on the list to be a fair and reasonable valuation of the

equipment and vehicles at that time. Therefore, it appears that Tru Wall undervalued its

equipment and vehicles by as much as $137,549.[5]

---

[4] Brock Franke, Tru Wall's accountant, testified that at the time of the $8,000
distributions, a physical payment was not made. In reviewing the books for the year, he
observed that neither Debtor nor Ohnstad had taken any wages. Therefore, he recharacterized
$8,000 of the distributions to each of them as wages. He said that the $8,000 sum was arbitrary
and did not reflect a certain amount of time worked.

[5] Even if the value of this equipment is reduced by 25% to reflect liquidation value
suggested by Mueller, there appears to be substantially more equity in Tru Wall than reflected on
its November and December 2010 balance sheets. Seventy-five percent of $182,662 is
$136,996.50, which is $91,882.66 more than the $45,113.84 in equipment and vehicles reflected
in Tru Wall's balance sheet in November and December 2010.

Tru Wall's records also reflect that, in early 2010, Tru Wall made distributions totaling $15,000 to both Debtor and Ohnstad.[6] In addition, Tru Wall's financial statements show accounts receivable totaled $251,399.08 in November 2010 and $238,311.12 in December 2010, suggesting opportunity for collection.

Contrary to the Trustee's testimony, Debtor and Ohnstad claimed that Tru Wall is currently backward on its loan, meaning that Ohnstad and Debtor would owe the bank money if they tried to sell out. At trial, Mueller testified that Western State Bank held a secured interest in all of Tru Wall's assets by virtue of the $100,000 loan Tru Wall used to buy out Concrete Specialists. Tru Wall's assets also secured a $75,000 revolving line of credit. On the date Debtor filed his bankruptcy petition, the outstanding debt to Western State Bank was $140,000. The equipment and vehicle list on which Western State Bank relied in making its loan to Tru Wall showed a value of $182,662. If the value estimates were correct, liquidation would result in a surplus of more than $42,000. Nevertheless, Mueller claimed that, applying a formula the bank uses in business liquidation situations, liquidation of Tru Wall would have resulted in the bank suffering a slight loss. Specifically, Mueller testified that the bank considers liquidation value to be 75% of the value of the collateral, not including accounts receivable which have no value in a liquidation context. In other words, to conclude that Tru Wall has no value, one must

---

[6] Debtor claimed he kept some of the money as wages and used some of the money to pay Concrete Specialists' bills and keep it operating. Incongruously, he testified he shut down Concrete Specialists in December 2009.

11

discount its equipment by 25% and ignore the opportunity to collect accounts receivable in excess of $200,000 ($198,094.42 of which was less than 30 days old on November 30, 2010).[7]

Although Tru Wall stopped doing business in January 2011, it still receives income[8] and makes payments toward its debt to Western State Bank.

      3.    <u>Negotiations for the Sale of Tru Wall and Tri-Star</u>

According to the Trustee, he has been in discussions with Ohnstad about buying Debtor's interests in Tri-Star and Tru Wall since January 2011. In March 2011, the Trustee presented his analysis of the value of the estate's interests to Ohnstad. The Trustee told Ohnstad that he believed the equity in Tri-Star was as high as $258,000 and the equity in Tru Wall as high as $153,000 for a total of $411,000. Discounting it for sale, the Trustee believed the estate's interest in Tri-Star was worth $93,000 and its interest in Tru Wall was worth $55,500. This was the Trustee's offer as a starting point in the negotiations. The parties could not reach an agreement at the time, and Ohnstad did not make an offer. The Trustee testified that Ohnstad did, however, subsequently make two offers to buy the estate's interest in both Tri-Star and Tru Wall, but the Trustee found the offers unacceptable. According to the Trustee, Ohnstad's highest offer was for the estate's interest in both entities for a total of $75,000. Ohnstad's last offer was to buy the estate's interest in just Tru Wall for $20,000. The parties have not reached an agreement.

---

[7] Estimated value of $182,662 x 0.75 = $136,996.50 less debt to Western State Bank of $140,000 = $-3003.50.

[8] All Finish leases a couple pickups and a boom truck from Tru Wall for $2,500 per month.

Ohnstad also testified about his negotiations with the Trustee.  Ohnstad denied that he extended any offer in the range of $60,000-$75,000.  As to the $20,000 offer to buy the estate's interest in Tru Wall, Ohnstad maintained that it was not really an offer, but was more of a discussion.  Further, he said the $20,000 had nothing to do with value, but rather, he did not want to spend a fortune on attorney's fees by continuing to negotiate.  Ohnstad also claimed that if the Trustee tried to sell the estate's interest in Tri-Star or Tru Wall he would stop a sale because he does not want to partner with someone he does not know.

4.    Debtor's House

In support of his claim that Debtor intentionally undervalued his house, the Trustee offered the testimony of Eric Grande, a real estate appraiser.  Grande prepared an appraisal of Debtor's house in 2008 in conjunction with a refinancing transaction.  In his appraisal dated May 14, 2008, Grande estimated that Debtor's house had a market value of $280,000.

On April 24, 2009, Debtor completed a financial statement for Western State Bank. Consistent with the appraised value, Debtor certified on this financial statement that the "true and correct" value of his house was $280,000.

Debtor tried to sell his house in 2009.  He listed it with a realtor from August 20, 2009, to January 11, 2010.  The original list price was $279,900, and the final list price was $274,900. Debtor received one written offer for $249,900 in November 2009.  He rejected it and counteroffered with $274,900.[9]

---

[9] At trial, Debtor insisted that the $274,900 counteroffer had nothing to do with value, but rather was the amount he needed to pay off the debt against the house.

13

Debtor claimed he received a second offer, which was conveyed to him by his realtor over the telephone. According to Debtor, the offer was so low that he told his realtor not to bother with a counteroffer.[10]

Grande prepared a second appraisal dated April 5, 2011, at the request of the Trustee. In the context of this appraisal, Grande completed a retrospective analysis and concluded that the market value of Debtor's house was $265,000 as of August 17, 2010, the date Debtor petitioned for bankruptcy relief. At trial, Grande explained that the $15,000 difference between this appraisal and his 2008 appraisal resulted from the decrease in comparable sale amounts during the intervening years. As further support for the decrease in market value, Grande explained that, in 2008, the area where Debtor's house is located was increasing in population, but the population increase was "less so" in 2010. He used four comparable sales to determine the value of Debtor's house in the 2011 appraisal. One of the comparable sales he used was located 20 miles from Debtor's house, a second was 16 miles from Debtor's house, and a third was 10 miles from Debtor's house. Three of the comparable sales were roughly a year prior to the appraisal. Grande's report clarifies that due to the sparse population of Argusville and the limited number of similar and recent sales, he found it necessary to consider comparable sales from competing surrounding communities.

Debtor did not offer an appraisal or the opinion of a professional appraiser to rebut Grande's testimony. Instead, he based the value of his house on his attempts to sell it. Specifically, Debtor testified that the value he recorded in his bankruptcy schedules was based

---

[10] The Trustee testified that Debtor told him he had received an oral offer on the house for $225,000.

14

on the last offer he received, $225,000.  He denied any attempt to deceive by listing the house at $225,000.

The tax assessed value of the house was $225,000 in 2009 and $236,000 in 2010.

## II.  CONCLUSIONS OF LAW

In his Complaint, the Trustee argues Debtor should be denied a discharge pursuant to 11 U.S.C. § 727(a)(2) because Debtor concealed property of the bankruptcy estate with intent to hinder delay or defraud creditors or the bankruptcy estate; and pursuant to 11 U.S.C. § 727(a)(4)(A) because Debtor made a false oath in his bankruptcy filings.

Section 727(a) of the Bankruptcy Code provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

* * *

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Bankruptcy Code], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

* * *

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account[.]

11 U.S.C. § 727(a).

Denying a debtor a discharge is a harsh remedy.  Allred v. Vilhauer (In re Vilhauer), 458 B.R. 511, 514 (B.A.P. 8th Cir.  2011).  Accordingly, section 727 is strictly construed in favor of

15

the debtor.  Id.  Notwithstanding, a discharge in bankruptcy and the associated fresh start are

privileges, not rights.  Bauer v. Iannacone (In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003)

(citing Grogan v. Garner, 498 U.S. 279, 286 (1991)).  "The opportunity for a completely

unencumbered new beginning is limited to the honest but unfortunate debtor."  Id.  The cost to

the debtor for an unencumbered fresh start is minimal, but it includes honestly and accurately

disclosing his or her financial affairs and cooperating with the trustee.  Id.; see also 11 U.S.C. §

521 (listing a debtor's duties in bankruptcy).

**A.     11 U.S.C. § 727(a)(4)(A)**

Section 727(a)(4)(A) bars the entry of a discharge if a debtor knowingly and fraudulently,

in or in connection with a case, made a false oath or account.  To meet his burden under this

subparagraph, the Trustee must prove that "'(1) Debtor made a statement under oath;[11] (2) the

statement was false; (3) Debtor knew the statement was false; (4) Debtor made the statement

with fraudulent intent; and (5) the statement related materially to Debtor's bankruptcy case.'"

Lincoln Sav. Bank v. Freese (In re Freese), 460 B.R. 733, 738 (B.A.P. 8th Cir. 2011) (citation

omitted).  To prevail in an action seeking denial of discharge, the objecting party must prove

each element by a preponderance of the evidence.  In re Vilhauer, 458 B.R. at 514.

The Bankruptcy Code, through section 727(a)(4)(A), "'requires nothing less than a full

and complete disclosure of any and all apparent interests of any kind.'"  Korte v. U.S. Internal

Revenue Serv. (In re Korte), 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001) (quoting Fokkena v. Tripp

---

[11] A debtor's signature on the petition, made under penalty of perjury, is a declaration
which has the force and effect of an oath of the kind encompassed by section 727(a)(4)(A).
Jordan v. Bren (In re Bren), 303 B.R. 610, 613 (8th Cir. BAP 2004) (overruled on other
grounds); Cepelak v. Sears (In re Sears), 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000).

(In re Tripp), 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998)).  "The debtor's duty of disclosure

requires updating schedules as soon as reasonably practical after he or she becomes aware of any

inaccuracies or omissions."  In re Bauer, 298 B.R. at 357.

The proper functioning of the entire bankruptcy process is dependent upon debtors

providing complete, accurate and reliable information in the petition and other documents

submitted with the filing of the case so that parties in interest may evaluate debtors' assets and

liabilities and appropriately administer the case.  In re Bren, 303 B.R. at 613-16.  Section

727(a)(4)(A) promotes veracity in the statements and schedules to help prevent creditors and the

trustee from having to resort to independent fact-finding and investigation.  Daniel v. Boyd (In re

Boyd), 347 B.R. 349, 354 (Bankr. W.D. Ark. 2006).  The disclosure requirement has

implications beyond the administration of each individual bankruptcy case.  "The failure to

comply with the requirements of disclosure and veracity necessarily affects the creditors, the

application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well

as the judicial system as a whole."  See National Am. Ins. Co. v. Guajardo (In re Guajardo), 215

B.R. 739, 742 (Bankr. W.D. Ark. 1997).

The Trustee argues Debtor made several false oaths in his bankruptcy filings:

undervaluing his ownership interests in Tri-Star and Tru Wall; undervaluing his house and

overstating the secured debt against it; omitting income from the two years preceding his

bankruptcy; and failing to promptly disclose $15,000 in distributions from Tru Wall.

1.      Debtor's Valuation of Tri-Star

As a preliminary matter, Debtor argues in his Amended Answer and post-trial brief that

the Trustee is estopped from challenging his valuation of the assets at issue.  The Trustee filed an

17

objection to Debtor's claimed exemptions based on Debtor's valuations of his house and his interests in Tru Wall and Tri-Star.  Debtor filed a response, and the Court set a hearing.  Prior to the hearing, the Trustee withdrew his objection to Debtor's exemptions.  Debtor argues, without citation, that the Trustee's failure to proceed with his challenge to Debtor's valuations of his assets as an exemption issue should bar the Trustee from claiming that Debtor's valuations are a basis for a denial of discharge.

A trustee may not contest the validity of a claimed exemption after the expiration of the 30-day period allowed for objections, even if the debtor has no colorable basis for claiming the exemption.  Taylor v. Freeland & Kronz, 503 U.S. 638, 643-44 (1992).  The Supreme Court in Taylor, however, listed specific alternatives for belatedly remedying wrongfully claimed exemptions, including a complaint seeking denial of discharge under section 727(a)(4)(B).  See generally Id.; Grueneich v. Doeling (In re Grueneich), 400 B.R. 680 (B.A.P. 8th Cir. 2009).  In other words, the Trustee is not estopped from claiming Debtor's valuations provide a basis for denial of discharge simply because he withdrew his objection to Debtor's exemptions.

Moving to the merits of the Trustee's assertions, the Trustee argues that Debtor made a false oath as to the value of his interest in Tri-Star on his bankruptcy schedules.  In response, Debtor asserts that the value of his interest in Tri-Star is limited by the fact that Debtor and Ohnstad are parties to a buy-sell agreement and that any potential buyer would be a 50% co-owner with Ohnstad.

In the exemption context, "value" means fair market value as of the petition date. 11 U.S.C. § 522(a)(2).  Valuing stock in a closely-held corporation can be difficult where the interest is a non-controlling stake in a closely-held corporation, as opposed to a tangible asset for

18

which there exists a reasonably ready market.  Courts consider a variety of factors in valuing

shares in a closely-held corporation, including:

(a)    The nature of the business and the history of the enterprise from its
       inception.
(b)    The economic outlook in general and the condition and outlook of the
       specific industry in particular.
(c)    The book value of the stock and the financial condition of the business.
(d)    The earning capacity of the company.
(e)    The dividend-paying capacity.
(f)    Whether or not the enterprise has goodwill or other intangible value.
(g)    Sales of the stock and the size of the block of stock to be valued.
(h)    The market price of stocks or corporations engaged in the same or a
       similar line of business having their stocks actively traded in a free and
       open market, either on an exchange or over the counter.

In re Frezzo, 217 B.R. 985, 989-90 (Bankr. E.D. Pa. 1998).  "Stock of closely-held corporations

cannot reasonably be valued by application of any inflexible formula; one tailored to the

particular case must be found.  This can be done only after a discriminating consideration of all

relevant facts and circumstances bearing upon the stock's value."  In re Harper, 157 B.R. 858,

863 (Bankr. E.D. Ark. 1993) (citing 12 B William M. Fletcher, Fletcher Cyclopedia of the Law

of Corporations, § 5906.120 (supp. 2007).  No one factor governs the valuation of shares of

stock in a closely-held corporation and all factors should be considered.  Id.

    "Once the value of a closely-held corporation's shares is determined, the application of

discounts may be appropriate in certain situations."  Id.  For example, it is appropriate to

consider a shareholder's minority position and the lack of marketability of stock in discounting

the value of the stock.  In re The Minnelusa Co.,176 B.R. 954, 956 (Bankr. M.D. Fla. 1994).

The purpose of a marketability discount is to "'adjust for a lack of liquidity in one's interest in an

entity, on the theory that there is a limited supply of potential buyers for stock in a closely-held

corporation.'"  Swope v. Siegel-Robert, Inc., 243 F.3d 486, 493 (8th Cir. 2001) (citation omitted).

19

One way to account for lack of liquidity is to apply a percentage discount against the stock value. In re Harper,157 B.R. at 863 (citing Hubbard v. United States (In re Hubbard), 135 B.R. 430 (Bankr. S.D. Fla.1991; In re Opelika Mfg. Corp., 66 B.R. 444 (Bankr. N.D. Ill.1986); In re Murphy v. Comm'r, 1990 WL 125107; In re Seagroatt Floral Co., 583 N.E.2d 287 (1991); Institutional Equip. & Interiors, Inc. v. Hughes, 562 N.E.2d 662 (1990)).  The purpose of a minority ownership discount is to adjust for a lack of control over the corporation on the theory that the minority shares of stock are not worth as much as the majority holdings due to the lack of voting power.  See In re Reading Broadcasting, Inc., 2008 WL 2705547 at *6 n.12 (Bankr. E.D. Pa. 2008).

In this case, neither party offered expert testimony on the value of Debtor's interest in Tri-Star or the appropriate discount that should be applied in this case.  Debtor claims his interest in Tri-Star has no value because no potential buyer would want to be a 50% owner with Ohstad.  In other words, Debtor suggests that any value in Tri-Star should be discounted by 100% due to his business arrangement with Ohnstad.

In considering case law addressing marketability and minority ownership discounts and applying the factors for valuing closely-held corporations to the evidence in this case, the Court is not persuaded that the 100% discount suggested by Debtor is appropriate.

Debtor paid $25,000 to buy Burnside's 25% interest in Tri-Star in January 2009.  Just four months later, Debtor certified that the value of his interest in Tri-Star was $63,000 on a personal financial statement he provided to Western State Bank.  As of April 2009, the appraised value of Tri-Star's property was $640,000, and there was no credible evidence that the value of Tri-Star's property was or is decreasing in value.  Also, Debtor's tax returns show, and testimony

20

from Western State Bank's business banking officer confirms, that Tri-Star was and is meeting

its debt obligations.  By the end of 2010, Tri-Star had reduced its debt to Western State Bank

from $519,473.72 to $457,661.56.  At trial, Mueller testified that Tri-Star's loan balance was

currently $425,000, suggesting that Tri-Star continues to be a viable business and that its equity

continues to grow.  Tri-Star's tax returns also reflect that Tri-Star realized net rental real estate

income of $23,569 in 2009 and $35,739 in 2010, and that the partners' equity/Tri-Star's book

value increased from $113,087 in 2009 to $142,146 in 2010.  Tri-Star was operating on the date

Debtor petitioned for bankruptcy relief and it is still operating today.  Although the number of

commercial tenants leasing Tri-Star property is down from three to one, Tri-Star is renting its

entire space to that one tenant--All Finish.  Since All Finish is owned entirely by Ohnstad, who

is also a 50% owner of Tri-Star, Ohnstad has an interest in maintaining Tri-Star as an on-going

business.  Consequently, Tri-Star has intangible value to at least one of its owners beyond a mere

investment option.

Debtor argues that if Tri-Star's assets were sold, the proceeds would be barely adequate

to pay the debt against the assets.  Debtor did not offer a formal appraisal in support of this

claim.  Rather, he offered Ohnstad's opinion and his opinion that, based on unspecified property

sales and their experience in the construction industry, no one would purchase the property for a

sum in excess of the debt against it.  Given that Ohnstad has participated in settlement

negotiations for the purchase of Debtor's interest and given that the sale of Debtor's interest may

result in Ohnstad being forced into a business relationship with a third party, Ohnstad's opinion

does not appear to be objective.  Further, the Court did not find either Ohnstad or Debtor to be a

credible witness on this issue.

Weighing Ohnstad and the Debtor's testimony against the other evidence summarized above, the Court finds, by the greater weight of the evidence, that the value of Debtor's interest in Tri-Star substantially exceeds Debtor's estimate of $1.00, even with marketability and minority ownership discounts.[12]

Debtor also suggests that the value of his interest in Tri-Star is nominal due to the terms of the buy-sell agreement. Specifically, Debtor argues that using the formula in the buy-sell agreement, Debtor's interest in Tri-Star had no value on the date of his petition. In other words, if Debtor had attempted to sell his ownership interest in Tri-Star, Debtor maintains Ohnstad could invoke the terms of the buy-sell agreement and compel Debtor to sell Debtor's interests in Tri-Star to Ohnstad for $0.

Under the terms of the buy-sell agreement, the default purchase price for Tri-Star is the "value as reported on the real estate tax statement for the year prior to the year of sale." Debtor's Ex. 109.[13] Tri-Star's 2010 Property Tax Statement provides that the estimated market value of its property was $437,000 for 2009, the year before Debtor filed his bankruptcy petition. The 2010 Property Tax Statement for the Eid property owned by Tri-Star provides that the estimated

---

[12] Although Debtor is not a minority owner, he owns a non-controlling interest.

[13] As noted in the Findings of Fact, two copies of the buy-sell agreement were received at trial. The first copy, which was dated and signed, did not include a stipulated purchase price for each unit offered for sale. Consequently, under the terms of the agreement, the parties must look to the default value as reported on the real estate tax statement for the year prior to the year of sale. Debtor's Ex. 109. The second copy of the buy-sell agreement, which was not dated, include the words "tax value" scribbled in blanks designated for the purchase price. It is not clear who wrote these words or what the "tax value" of each unit to be sold under the agreement would be because the parties offered no evidence of this value. Consequently, this formula will not be considered by the Court.

22

value of this property was $59,000 in 2009.  Adding the two property tax statement values together and discounting the price to "85% of the Real Estate value" for a "lifetime transfer," the purchase price under the buy-sell agreement is $421,600.  Although the terms of the agreement are not clear, presumably Ohstad could compel Debtor to accept only 50% of the discounted real estate value, since Ohnstad would be seeking to purchase Debtor's 50% interest.  If this is the case, Ohstad could compel Debtor to sell his interests for the purchase price of $210,800, not $0 as argued.

In his brief, Debtor suggests that the debt against the property must be subtracted from the purchase price.  However, the buy-sell agreement includes no such term.  The Court is not inclined to imply such a term for the benefit of Debtor since Debtor did not consider the buy-sell agreement in determining the value he entered on his bankruptcy schedules.  To the contrary, he testified that he did not have a copy of the agreement at the time he petitioned for bankruptcy relief and did not consider the agreement in his value determination.  Further, there is no evidence that the buy-sell agreement played any role in Debtor's negotiated purchase of Burnside's interest in Tri-Star for $25,000, and there is no evidence the formula in the agreement played any role in Ohnstad's negotiations with the Trustee for buy-out of Debtor's interest.  Under the circumstances, the Court will not give the buy-sell agreement more weight than it deserves.

Accordingly, the Court finds that Debtor's statement on Schedule D that the value of his interest in Tri-Star was $1.00 was a false oath.  See In re Bren, 303 B.R. at 613 (stating that a debtor's signatures on the petition, made under penalty of perjury, are declarations which have

23

the force and effect of oaths of the kind encompassed by the discharge exception in 727(a)(4));
In re Sears, 246 B.R. at 347 (same).

Next, the Court considers whether Debtor knew his valuation was false and whether he had the requisite fraudulent intent.  Statements made with reckless indifference to the truth are regarded as intentionally false.  In re Korte, 262 B.R at 474.  Fraudulent intent may be established by circumstantial evidence.  Id.

Debtor bought Burnside's 25% interest in Tri-Star for $25,000 in January 2009.  In April 2009, Debtor valued his 50% interest in Tri-Star at $63,000 on a personal financial statement. Debtor knew the appraised value of Tri-Star's property substantially exceeded the debt against it. In addition, Tri-Star's tax returns show that, from April 2009 until Debtor's bankruptcy filing in August 2010, Tri-Star's financial health improved, and Debtor offered no evidence to the contrary.  Therefore, the Court finds that, at the very least, Debtor's valuation of his interest in Tri-Star at $1.00 was made with reckless indifference to the truth and that he had the requisite fraudulent intent.

Finally, for a false oath or account to bar a discharge, the false statement must be material.  In re Freese, 460 B.R. at 738.  The threshold to materiality is fairly low.  In re Korte, 262 B.R. at 474.  The subject matter of a false oath is "material" and sufficient to bar discharge if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings or the existence and disposition of his property.  Id.  The value of Debtor's interest in Tri-Star unquestionably bears a relationship to the estate and its assets.

Accordingly, the Trustee has met his burden of proving that Debtor made a false oath as to the value of Debtor's interest in Tri-Star, warranting a denial of his discharge under section 727(a)(4).

2.    Additional Alleged False Oaths

The Trustee alleges Debtor made several other false oaths in connection with this case. Although Debtor's false oath as to the value of his interest in Tri-Star alone warrants a denial of discharge, the Trustee's additional allegations merit discussion.

As to the $1.00 value Debtor placed on his interest in Tru Wall, Debtor testified that his valuation was based in part on the fact that Tru Wall was not operating when he filed for bankruptcy. However, Ohnstad and the Trustee both testified that Tru Wall stopped doing business in January 2011, more than four months after he filed his bankruptcy petition.

Debtor also claimed Tru Wall's debts were larger than its assets on the date of his bankruptcy petition. Debtor's claim is not consistent with information provided by Western State Bank. Mueller testified that Tru Wall's outstanding debt to Western State Bank was $140,000 on the date of Debtor's filing, and an equipment list from April 2010 – just a few months before Debtor's bankruptcy – shows Tru Wall possessed equipment and vehicles valued at $182,662. In addition, Tru Wall's November 2010 accounts receivable totaled $251,399.08 ($198,094.42 of which was less than 30 days old on November 30, 2010, three months after Debtor filed his bankruptcy petition). Tru Wall's financial statements also show that its assets exceed its liabilities.

Presumably, Debtor relies on Mueller's testimony that, in applying a formula used routinely by Western State Bank, Tru Wall's "liquidation" value is less than the debt against it.

25

While ignoring accounts receivable and reducing the value of equipment and vehicles by 25% may be appropriate for risk assessment the bank uses in its lending practices, the Court is not persuaded that this formula is appropriate for valuing Debtor's interest in Tru Wall under the circumstances in this case.  First, considering the fact Tru Wall was still doing business on the date of the bankruptcy petition and had made no plans to sell its assets, there appears no justification for using a liquidation analysis formula that ignores accounts receivable and substantially discounts its equipment and vehicles.  Even after Tru Wall stopped doing business, Tru Wall continued to collect rental income and pay its debt to Western State Bank, providing additional support for the proposition that applying a liquidation formula is inappropriate.

Second, there is no evidence that Debtor relied on the bank's liquidation formula in his decision to value his interest in Tru Wall at $1.00 on his bankruptcy schedules or in certifying that the value of his interests in Tru Wall was $25,000 in the April 2009 personal financial statement he provided to Western State Bank.  Consequently, he may not rely on it now to support his valuation of Tru Wall.

The positive equity shown on Tru Wall's financial statements together with Tru Wall's Equipment/Vehicle List dated April 16, 2010 and its distributions of $15,000 each to Ohnstad and Debtor in 2010 support the Trustee's claim that Debtor undervalued his interest in Tru Wall. Likewise, Ohnstad's offer to buy Debtor's interest in Tru Wall from the Trustee for $20,000 also supports the proposition that Debtor's interest in Tru Wall is worth more than $1.00.  Viewed as a whole, the evidence supports the conclusion that Debtor's valuation of his interest in Tru Wall at $1.00 was false.

26

The Trustee also argues that Debtor made a false oath as to the true value of his house and the debt against it in his bankruptcy filings.  In Schedule A, Debtor listed the value of his house as $225,000.  Eric Grande, who prepared a formal appraisal of the house in May 2008, estimated the value of Debtor's house was $280,000 in May 2008.  He also prepared a retrospective appraisal valuing the house at $265,000 as of the date the Debtor petitioned for bankruptcy relief.[14]  In a financial statement Debtor provided to Western State Bank in April 2009, Debtor listed the value of his house as $280,000.  Beginning in August 2009, Debtor listed his house for sale with a realtor.  The original list price was $279,900, and the final list price was $274,900.  He received only two offers.  The first offer was for $249,900 in November 2009.  A copy of this written offer was received into evidence.  Debtor's testimony served as the sole basis for the second offer for $225,000, which reportedly came from some unknown buyer on an unknown date.

Despite the May 2008 appraisal and Debtor's representation to Western State Bank (in a financial statement) and to the general public (in the list price of this house), suggesting that he thought the value of his house exceeded $274,900, Debtor entered $225,000 as the value of his house on Schedule A.  Debtor testified that this figure was based on the last offer he received.[15]

––––––––––––––––––

[14] As Debtor highlighted, the appraisal has some shortcomings including that three of the four comparable sales used in the analysis were more than 10 miles from Debtor's house.  Also, three of the four comparable sales were approximately a year before the effective date of the appraisal.  Grande addressed these shortcomings in his report by clarifying that, due to the sparse population of Argusville and the limited number of similar and recent sales, he found it necessary to consider comparable sales from competing surrounding communities.

Debtor did not offer expert testimony suggesting a different value.

[15] At trial, Debtor offered, and the Court received, Exhibit 111 showing that the estimated value of Debtor's house according to the Cass County Tax Assessor was $225,000 in 2009 and $236,000 in 2010.  While such value estimates may be used as an indicator of market value,

However, in response to questions on cross examination, Debtor admitted that he thought his house was worth more than $225,000.

The best evidence of the value of Debtor's house is the retrospective appraisal, in which Grande valued the house at $265,000, and the written offer of $249,900 received by Debtor in November 2009.  Accordingly, the Court finds that the value of Debtor's house lies somewhere in between these figures.  The Court declines to select one specific number representing the "true value" of Debtor's house because it does not need to do so in this case.  The Court need only determine whether Debtor's value estimate was intentionally false or offered with reckless disregard for the truth.

While offers to purchase may be an indicator of the value of the property,[16] the Court is not convinced that the $225,000 offer – which was $22,000 less than the November 2009 offer and $55,000 less than the 2008 appraisal and initial offering price – represents a good faith value estimate.  In reaching this conclusion, the Court considered:  (1) the figure Debtor elected to record on Schedule A was significantly smaller than the other more credible options available to

---

there is no evidence that this figure played any role in Debtor's determination of value.  In other words, Debtor did not testify that he relied on the tax assessment when completing Schedule A.  To the contrary,  Debtor based this number on the last offer he received.

Further, the Court finds that Grande's retrospective appraisal is better evidence of the value of Debtor's house on the date of the bankruptcy petition than the value noted on the Cass County tax statement.

[16] Grueneich v. Doeling (In re Grueneich), 400 B.R. 680, 687 (B.A.P. 8th Cir. 2009) (an offer to purchase an asset normally constitutes strong evidence of the asset's value);  but see General Elec. Credit Equities, Inc. v. Brice Road Developments, L.L.C. (In re Brice Road Developments, L.L.C.), 392 B.R. 274, 282 (B.A.P. 8th Cir. 2008) (rejecting appellant's argument that the bankruptcy court erred by not giving sufficient weight to a purchase offer where the bankruptcy court considered all relevant evidence presented, including the purchase offer, a tax assessment, and an underwriter's valuation but ultimately found them unpersuasive in light of appraisals in evidence).

him; (2) Debtor rejected the $225,000 offer and declined to counteroffer because it was so low; and (3) Debtor  agreed with the Trustee's counsel on cross examination that this number did not reflect his opinion of the value of his house.  Accordingly, the Court finds that value he listed on Schedule A is false and that Debtor entered this value on Schedule A with reckless disregard for the truth.

The next question is materiality.  Debtor claims that, even if this Court finds that Debtor should have used the earlier and higher offer he received ($249,900), the use of this figure would not have concealed equity in the house.  In other words, Debtor argues that the false value on Schedule A is not material because it did not result in Debtor profiting from the concealment. This is not the test for materiality.

As noted above, the test for materiality is whether the subject matter of the false oath bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings or the existence and disposition of his property.  Korte, 262 B.R. at 474. "It does not matter whether any specific monetary harm resulted from the false oath."  Fokkena v. Tripp (In re Tripp), 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998).  A debtor may not escape denial of discharge under section 727(a)(4)(A) by claiming that omitted or falsely stated information pertained to a worthless asset.  Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 618 (11th Cir. 1984) ("The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious.");  Moreo v. Rossi (In re Moreo), 437 B.R. 40, 66-67 (Bankr. E.D.N.Y. 2010) (false oaths about assets of the estate, even if they are worthless or exempt, may be sufficient to warrant a denial of discharge).  While the

29

value of omitted assets is relevant to materiality, the materiality analysis does not turn on value.

In re Sears, 246 B.R. at 347.  "An omission of a relatively modest asset will merit denial of

discharge, if done with knowledge and fraudulent intent."  Id.  Furthermore, the fact that a

particular asset has equity that may be claimed as exempt does not render an omission or falsity

immaterial.  Mertz v. Rott, 955 F.2d 596, 598 (8th Cir.1992) (nondisclosure of $1,358 exempt

tax refund was material because it was an asset of the estate and therefore bore a relationship to

the estate).[17]  Debtors are obligated to disclose their assets and transactions and leave to the

trustee or creditors the impact on their estates.  In re Rohde, 400 B.R. at 235.

The Trustee also challenged Debtor's representation that the total mortgage debt against

his house was $258,000.  The Trustee requested verification of the debt against the house and

discovered that Debtor had overstated the debt.  Debtor listed total of the first mortgage as

$224,000, but the actual sum due and owing on the date of his petition was $216,963.96.  Debtor

listed the amount of the second mortgage owed to Western State Bank as $34,000, but the

---

[17] See also Song v. Acosta (In re Song), 2011 WL 6934462, at *8 (B.A.P. 9th Cir. Sept. 30, 2011) (nondisclosure of a $1,980 monthly Social Security benefit was material even though they could be exempted); Woodard v. Peters (In re Peters), 2011 WL 9082, at *2 (Bankr. N.D. Tex. Jan. 3, 2011) (assets, whether exempt or not, are material to a bankruptcy case); Wachovia Bank v. Voccia (In re Voccia), 2011 WL 351187, at *8 (Bankr. E.D. Va. Feb. 1, 2011) (the fact that a debtor could exempt omitted assets does not make false oaths about them immaterial); Bear Rock Franchise Sys., Inc. v Hedlund (In re Hedlund), 2010 WL 2306672, at *3 (Bankr. D. Neb. June 7, 2010) (same); Shamban v. Larson (In re Larson), 2010 WL 1633466, at *6 (Bankr. D. Mass. April 20, 2010) (same); Bernhardt v. Radloff (In re Radloff), 418 B.R. 316, 322 (Bankr. D. Minn. 2009) (same); In re Rohde, 400 B.R. 230, 235 (Bankr. N.D. Iowa 2009) (the failure to schedule an asset or to list a prepetition transfer is not immaterial merely because the asset might have been claimed exempt or because the transfer ultimately may not be recoverable under a trustee's avoidance powers); Buckeye Ret. Co., LLC, Ltd. v. Bullough (In re Bullough), 358 B.R. 261, 268 (Bankr. N.D. Tex. 2007) (assets, whether exempt or not, are material to a bankruptcy case); Buckeye Ret. Properties of Indiana, LLC v. Tauber (In re Tauber), 349 B.R. 540, 560 (Bankr. N.D. Ind. 2006) (the materiality of an omission is not lessened by the fact that the assets transferred may have been exempt).

Trustee received a bank statement dated September 10, 2010, listing the outstanding balance on

the second mortgage as of that date as $31,399.46.  Debtor claimed it was a mistake, but waited

more than three weeks <u>after trial</u> to file Amended Schedule D.  Although a debtor has an

absolute right to amend his schedules, <u>see</u> Fed. R. Bankr. P. 1009(a), Debtor's initial disclosure

of the debt was false.[18]

The Trustee also argues that Debtor's omission of the $15,000 in distributions from Tru

Wall in his Statement of Affairs constitutes a false oath.  Debtor again claimed he made a

mistake in not listing the distributions.  He also omitted some of his income from the two years

preceding his bankruptcy.  Specifically, Debtor filed an Amended Statement of Financial Affairs

on January 19, 2011, adding $44,950 in 2010 gross income from All Finish and $17,548 for

"2009 Adjusted Gross Income."  Although Debtor could not be expected to have known the total

---

[18] In his brief, Debtor suggests that there was no need to promptly amend his schedules to provide correct information about the balance of debt owed on his house because he provided this information to the Trustee.  Bankruptcy schedules provide information about a debtor's financial position to not only the trustee, but also to creditors, other interested parties and the court.  <u>See</u> <u>Lewis v. Summers</u> (<u>In re Summers</u>) 320 B.R. 630, 643 (Bankr. E.D. Mich. 2005) ("[T]he schedules and statement of financial affairs filed by a debtor are the core of all bankruptcy cases, upon which creditors, the courts, and other interested parties rely."); <u>In re Edwards</u>, 2003 WL 22016324, at *8 (Bankr. D. Vt. Aug. 26, 2003) ("The integrity and effectiveness of the bankruptcy process is founded upon the premise that debtors file complete and accurate schedules, upon which the Court, trustees and creditors can rely.").  Providing updated or more accurate information to the bankruptcy Trustee is, therefore, not a substitute for promptly amending schedules.  <u>Bank of India v. Sapru</u> (<u>In re Sapru</u>), 127 B.R. 306, 317 (Bankr. E.D.N.Y. 1991) (subsequent disclosure by a debtor is not sufficient to overcome the allegations of false oath or account).  Furthermore, the trustee should not be forced to ferret out the actual debt against or equity in a piece of property by paging through disclosures provided outside the bankruptcy schedules.  <u>See</u> <u>In re Sears</u>, 246 B.R. at 347; <u>Boroff v. Tully</u> (<u>In re Tully</u>), 818 F.2d 106, 110 (1st Cir. 1987) ("Neither the trustee not the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.").  Rather, a debtor has a duty to promptly amend his schedules.  <u>See</u> <u>Bauer</u>, 298 B.R. at 357 (a debtor's duty of disclosure requires updating schedules as soon as reasonably practical after he or she becomes aware of any inaccuracies or omissions).

of his 2010 gross income from All Finish in August 2010, he would have had at least an estimate of his 2010 earnings from January to the date he filed his bankruptcy petition.  More troublesome is the added entry for 2009 income because Debtor should have known that amount at the time of filing.  Debtor offered no explanation as to the omission of either of these items.

The surrounding circumstances and the debtor's course of conduct may be essential in determining the debtor's subjective state of mind because of the improbability that the debtor will concede fraudulent intent.  In re Sears, 246 B.R. at 349-50.  Courts are often understanding of a single omission or error resulting from an innocent mistake, but multiple inaccuracies or falsehoods may rise to the level of reckless indifference to the truth, which is the functional equivalent of fraudulent intent.  Kaler v. Geller (In re Geller), 314 B.R. 800, 807 (Bankr. D.N.D. 2004).

Reviewing all of the evidence, the Court concludes that Debtor's undervaluation of his house and his interest in Tru Wall, his erroneous disclosure of the debt against his house, and the multiple omissions on his Statement of Affairs rise to the level of reckless indifference to the truth.  The statements related materially to Debtor's bankruptcy case.

For these reasons, the Court concludes that Debtor knowingly and fraudulently made false oaths in connection with this case.  The Trustee met his burden of proof under section 727(a)(4)(A).

**B.    11 U.S.C. 727(a)(2)(B)**

Finally, the Trustee seeks a denial of Debtor's discharge under section 727(a)(2), which bars the entry of a discharge if –

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Bankruptcy

32

Code], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2).

The Trustee seeks a denial of discharge under section 727(a)(2)(B). The elements of proof under sections 727(a)(2)(A) and (B) are virtually the same, differing only in the requisite timing of the debtor's acts and nature of the property involved. To prevail under section 727(a)(2)(B), the Trustee must prove by a preponderance of the evidence: (1) the act complained of was done on or after the petition date; (2) the act was that of Debtor; (3) the act amounted to a transfer, removal, destruction, mutilation, or concealment of property of the bankruptcy estate; and (4) the act was done with an intent to hinder, delay, or defraud a creditor or the trustee. See Fokkena v. Juehring (In re Juehring), 332 B.R. 587, 591 (Bankr. N.D.Iowa 2005); Kaler v. Huynh (In re Huynh), 392 B.R. 802, 810 n.4 (Bankr. D.N.D. 2008).

The Trustee alleges that Debtor concealed assets of the estate by minimizing their value in order to avoid the Trustee's liquidation of those assets to pay creditors. As detailed above, the Court concluded that Debtor undervalued his interests in Tri-Star, Tru Wall and his house in his bankruptcy petition. This act amounted to concealment of their true value. The evidence establishing Debtor's knowledge and intent under section 727(a)(4) likewise establishes his fraudulent intent under section 727(a)(2). The Trustee met his burden of proving that Debtor concealed the value of his house and his interests in Tri-Star and Tru Wall, warranting a denial of his discharge under section 727(a)(4)(B).

33

The Court has considered all other arguments and deems them to be without merit.

Accordingly, the Court denies Debtor Dennis J. Charles a bankruptcy discharge pursuant to 11 U.S.C. § 727(a)(2) and (4).

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this February 14, 2012.

  /s/  SHON HASTINGS              
**SHON HASTINGS, JUDGE**
**UNITED STATES BANKRUPTCY COURT**

34